# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cr-159 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| RONALD MICKEL, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the *pro se* motion of defendant Ronald Mickel ("Mickel" or "defendant") to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Doc. No. 83 (Motion); *see* Doc. No. 83-1 (Memorandum in Support).) Plaintiff United States of America (the "government") has filed an opposition. (Doc. No. 87 (Response)), and Mickel has filed a reply. (Doc. No. 91 (Reply).) For the reasons set forth herein, the motion to vacate is DENIED.

## I.     BACKGROUND

On March 4, 2020, an indictment was returned by a federal grand jury charging Mickel with one count of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. No. 10 (Indictment).)[1] Shortly after the indictment issued, courts across the country (and, in fact, around the world) were impacted by the COVID-19 pandemic. In the

---

[1] Specifically, the indictment provided that, on November 26, 2019, Mickel knowingly possessed 32 rounds of 9mm Luger FMJ ammunition stamped FC, knowing he had previously been convicted in the Lorain County Court of Common Pleas of aggravated robbery, a second degree felony. (*Id.* at 1 (All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.).)

Northern District of Ohio, over the next several months, the result was a series of court closures that had the effect of canceling and/or delaying trials and other in-person proceedings. (*See, e.g*, N.D. Ohio Gen. Order No. 2020-05-1 (First Closure Order).)

Amidst these closures, the Court conducted a series of video status conferences in this case with counsel and Mickel to discuss pretrial matters, including projected dates for reopening the court and potential trial dates. (*See* Minute Order [non-document], 3/25/2020; Minute Order [non-document], 6/10/2020; Minute Order [non-document], 6/12/2020.) At each of these conferences, defense counsel emphasized that his client wished to proceed to trial as soon as possible. (*See, e.g*., Doc. No. 52 (Transcript of June 10, 2020 Status Conference), at 9.) At one such conference, defense counsel represented:

> I think right now, we have a trial date for the end of June [2020]. Mr. Mickel still wishes to go to trial. I've explained to him, however, that the general orders from the chief judge have stayed all jury trial proceedings through the end of July [2020].
>
> Mr. Mickel desires a speedy trial. I've explained to him the speedy trial rights and that the Court can make a finding that speedy trial is waived because of the general order. He understands this, and I would ask the court to schedule a jury trial as soon as it can . . . .

(*Id*. at 9.) When the Court inquired directly of Mickel, he confirmed that it was his desire to go forward with trial. (*Id*. at 10; *see also* Doc. No. 53 (Transcript of June 12, 2020 Status Conference), at 5 (The Court: "So, Mr. Mickel, how does August sound to you [to try the case]? That was your desire, correct?" The Defendant: "Yes, your honor.").)

Based on Mickel's clear and unwavering desire to proceed to trial as soon as possible, the Court agreed to designate Mr. Mickel's case as the first case on the docket to be heard as soon as

the closures were lifted by the chief judge. (Doc. No. 53, at 5.)[2] The case was, in fact, the first case tried in the Akron federal courthouse following the reopening of proceedings, and the jury was seated on September 21, 2020. (Minutes of Proceedings [non-document], 9/21/2020.) At the beginning of the trial, the parties stipulated to two facts: (1) that Mickel was aware that he previously had been convicted of a crime punishable by more than one year of prison; and (2) that the ammunition in question was manufactured outside the State of Ohio and, therefore, traveled in interstate commerce. (Doc. No. 56 (Trial Transcript), at 16–17.)

The government produced evidence that, in November 2019, Mickel was renting a house in Lorain, Ohio with his then-girlfriend, Jameesha Cobbs. At the time, Mickel was on probation for a prior Ohio state court conviction. As part of the terms of his supervision, Mickel was prohibited from "purchas[ing], possess[ing], own[ing] or hav[ing] under [his] control" any firearms or ammunition and was subject to probable cause searches. (*Id.* at 27.) Two witnesses, both employees of the Ohio Adult Parole Authority ("APA"), were called by the government. APA Officer Daniel Riley testified that, on November 8, 2019, he received a call from Cobbs who told him that Mickel had a firearm in the Lorain, Ohio house and that he was dealing drugs out of the house. (*Id.* at 27–28.) Following Mickel's positive drug screen, Officers Riley and Jeff Jones visited Mickel's residence on November 26, 2019, and conducted a probable cause search. (*Id.* at 28–29.) During the search, Officer Jones located 32 rounds of 9mm Ruger ammunition in the pocket of a man's suit jacket hanging in a closet in the front room. (*Id.* at 30–31.) Officer Jones

---

[2] Because the general order that first reopened the courts in the Northern District of Ohio provided for a phased-in approach that only permitted one trial at a time in the John F. Sieberling Federal Building and U.S. Courthouse (the "Akron federal courthouse"), the undersigned conferred with her colleague in Akron, who agreed that Mickel's case could proceed first. (*Id.* at 4–5.)

alerted Officer Riley to the ammunition, and Mickel, only a few feet away from Jones, said, "That's not mine. I found that in the basement when I moved in and moved it up here so nobody would mess with it." (*Id*. at 34, 44, 55.)

Mickel's defense theory was that Cobbs had planted the ammunition to "get [Mickel] into trouble." (*See id*. at 73.) He also called two witnesses during his case-in-chief. His former landlord at the Lorain, Ohio residence, Raymond Campana, testified that Mickel and Cobbs had lived in the house, along with Mickel's daughter and Cobbs' three teenage sons. (*Id*. at 82–83.) He further testified that after the couple ended their relationship and Cobbs moved out in September 2019, Cobbs contacted Campana "[p]robably four or five times a day." (*Id*. at 83–85.) She called so often that Campana stopped answering the phone when he saw her number on the display. (*Id*. at 85.) Additionally, he testified that, after Cobbs moved out, he had to repair a damaged bedroom window and a side door that had been "kicked in." (*Id*. at 87–88.) A second witness, Lorain Police Officer Efrain Torres, testified that on November 4, 2019—22 days before the discovery of the ammunition—he responded to a report of a domestic disturbance at the Lorain, Ohio house. (*Id.* at 92–93.) According to Torres, Mickel voluntarily permitted him to enter the residence and placed no restrictions on his movements within the residence. (*Id*. at 96.) He further testified that Cobbs appeared upset during the encounter. (*Id*. at 94.)

At the conclusion of the 2-day jury trial, the jury returned a guilty verdict on the sole charge in the indictment. (Doc. No. 41 (Jury Verdict).) Prior to sentencing, a final revised presentence investigation report ("PSR") was prepared. (Doc. No. 61 (PSR).) The PSR writer determined that the applicable adjusted offense level was 24. (*Id*. at 4 ¶ 20.) He also determined, however, that defendant qualified as an armed career criminal, under the Armed Career Criminal Act ("ACCA"),

and was subject to the enhancement under 18 U.S.C. § 922(g) because he had three or more prior domestic violence felony convictions in state court. (*Id*. at 5 ¶ 21.) Mickel's status as an armed career criminal increased his applicable offense level to 33, and with a criminal history category of IV, the corresponding advisory guideline range was 188 to 235 months.[3] (*Id*. at 5, 12, 18 ¶¶ 21, 23, 45–46, 76.) Additionally, the PSR indicated that the ACCA required a mandatory-minimum sentence of 15 years. (*Id*. at 18 ¶ 75.)

Defense counsel lodged multiple objections to the PSR relating to the determination that Mickel qualified as an armed career criminal. (*See* Doc. No. 63 (Sentencing Memorandum), at 7–23.) The Court addressed these objections in a lengthy sentencing hearing that was conducted on January 14, 2021, and continued, following supplemental briefing from the parties, on June 2, 2021. (Minutes of Proceedings [non-document], 1/14/2021; Minutes of Proceedings [non-document], 6/02/2021; *see* Doc. No. 66 (Defendant's Supplemental Sentencing Memorandum); Doc. No. 67 (Government's Response Sentencing Memorandum).) After entertaining arguments from counsel, the Court overruled Mickel's objections and found him to be an armed career criminal under the ACCA. (Doc. No. 75 (Sentencing Transcript), at 29.) In accordance with the PSR, the Court determined that the applicable advisory guideline range was 188 to 235 months. (*Id*. at 30.) The Court ultimately sentenced Mickel to a low-end guideline custody term of 188 months. (*Id*. at 49; *see* Doc. No. 70 (Judgment).)

Mickel took a direct appeal in which he challenged his designation as an armed career criminal under the ACCA. In particular, he argued that his domestic violence convictions did not

---

[3] Mickel was a criminal history category IV both because of his status as an armed career criminal and because his natural criminal history score was an 8. (*See* Doc. No. 61 at 12 ¶¶ 45–46.)

qualify as violent felonies under the ACCA, that he did not receive sufficient notice that he could be sentenced as an armed career criminal, and that the existence of his three predicate convictions should have been proven beyond a reasonable doubt at trial. (Doc. No. 76 (Sixth Circuit Opinion), at 2–5.) The Sixth Circuit rejected these arguments and affirmed the Court's judgment. (*See id*.) Mickel filed a petition for a writ of certiorari, and, on October 13, 2022, the United States Supreme Court denied the request for certiorari review. (Doc. No. 79 (United States Supreme Court Order).)

On September 21, 2023, Mickel filed the present motion to vacate. He raises three grounds for relief, all sounding in ineffective assistance of counsel. In particular, he challenges the effectiveness of his trial counsel in pretrial proceedings, during the jury trial, and at sentencing. The motion is ripe and ready for resolution.

## II.    STANDARD OF REVIEW

A federal prisoner may attack the validity of his sentence by filing a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 in the district court where he was sentenced. Section 2255 sets forth four grounds upon which a federal prisoner may state a claim for relief: "[1] the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] [the sentence] is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a).

To prevail under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). "Relief is warranted

only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974)).

The movant bears the burden of articulating sufficient facts to state a viable claim for relief under § 2255. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam). Vague and conclusory claims that are not substantiated by allegations of specific facts with some probability of verity are not enough to warrant relief. A § 2255 motion may be dismissed if it only makes conclusory statements without substantiating allegations of specific facts and fails to state a claim cognizable under § 2255. *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961); *see Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972).

When a factual dispute arises in a § 2255 proceeding, an evidentiary hearing is required "'to determine the truth of the petitioner's claims.'" *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)). The burden borne by a § 2255 petitioner to obtain a hearing is not especially onerous. *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003). However, a petitioner is not entitled to an evidentiary hearing if he has not alleged any facts that, if true, would entitle him to federal habeas relief. *See McSwain v. Davis*, 287 F. App'x 450, 458 (6th Cir. 2008); *Amr v. United States*, 280 F. App'x 480, 485 (6th Cir. 2008) (holding that an evidentiary hearing was "unnecessary" where there was "nothing in the record to indicate that [the petitioner] would be able to prove his allegations" at a hearing); *see also Napier v. United States*, No. 93-5412, 1993 WL 406795, at *2 (6th Cir. Oct. 8, 1993) (citing, among authorities, *Machibroda v. United States*, 368 U.S. 487, 496, 82 S. Ct. 510, 7 L. Ed. 2d 473 (1962)) ("To be entitled to a hearing, the prisoner must set forth detailed factual

allegations which, if true, would entitle him to relief under § 2255."); *cf. Valentine*, 488 F.3d at 334 (finding that the burden is met where the petitioner "offers more than a mere assertion . . . he presents a factual narrative of the events that is neither contradicted by the record nor 'inherently incredible'").

Moreover, a hearing is not necessary when a petitioner's claims "'cannot be accepted as true because they are contradicted by the record, inherently incredible, or [are] conclusions rather than statements of fact.'" *Id.* (quoting *Arrendondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). Where, as here, the judge considering the § 2255 motion also presided over the trial, the judge may rely on her recollections of the trial. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996).

The Court finds that an evidentiary hearing is not warranted in the present case. As set forth in detail below, Mickel has failed to identify facts that, if true, would entitle him to relief under § 2255. Moreover, many of the arguments offered by Mickel in support of the present motion are either contradicted by the record, not cognizable on habeas review, or are adverted to in a perfunctory and conclusory manner, preventing further review by this Court.

## III. DISCUSSION

Mickel attempts to ground his claims in the Sixth Amendment right to effective assistance of counsel. "To prevail on an ineffective-assistance-of-counsel claim, [Mickel] must satisfy the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020). Specifically, Mickel must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in

an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687–88; *see also Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The Court may address the *Strickland* prongs in any order and need not address both prongs if Mickel "makes an insufficient showing on one." *See Wingate*, 969 F.3d at 955 (quotation marks and citation omitted).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Judicial scrutiny of counsel's performance must be highly deferential[.]" *Strickland*, 466 U.S. at 689. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*. Counsel's performance must be evaluated from the perspective existing at the time of the representation, not from the perspective of hindsight. *Id*. Indeed, a prisoner must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, and that counsel's errors were so serious as to deprive him of a fair trial. *Strickland*, 466 U.S. at 687–88; *United States v. Hanley*, 906 F.2d 1116, 1120–21 (6th Cir. 1990); *Flippins v. United States*, 808 F.2d 16, 18 (6th Cir. 1987); *see also United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (citing *Strickland*, *supra*) ("Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won.").

### A.  Pretrial Proceedings (Ground One)

In his first ground for relief, Mickel alleges that his counsel failed to "(1) [c]ommunicate with Mickel and inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial; and (2) [c]onduct an adequate and independent pretrial investigation [and therefore] deprived Mickel of effective assistance of pretrial counsel under the

Sixth Amendment of the Constitution of the United States." (Doc. No. 83, at 4.) He maintains that defense counsel "never presented options to Mickel," "never discussed any strategy with Mickel, nor [did] his counsel ever discuss[] the correct possible outcome of a trial." (Doc. No. 83-1, at 12–13.)

### 1. Communicating Options/Consequences

The Sixth Circuit has held:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available.

*Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003); *see Miller v. Straub*, 299 F.3d 570, 580 (6th Cir. 2002) (holding that "[t]he duty of defense counsel to consult is paramount when a client has to decide whether or not to waive a constitutional right, such as the right to trial"); *see also Short v. United States*, 471 F.3d 686, 692 (6th Cir. 2006) (holding that a "defendant challenging his attorney's conduct during plea bargaining 'must show that counsel did not attempt to learn the facts of the case and failed to make a good-faith estimate of a likely sentence. He must also show that his lawyer's deficiency was a decisive factor in his decision to plead guilty'" (quoting *United States v. Cieslowski*, 410 F.3d 353, 358–59 (7th Cir. 2005))).

An attorney must also "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *See Missouri v. Frye*, 566 U.S. 134, 145, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012). The Sixth Circuit has held that "a defense attorney's failure to communicate a plea offer to his or her client constitutes deficient performance as a matter of law." *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir. 2004) (citing *Griffin v.*

*United States*, 330 F.3d 733, 737 (6th Cir. 2003)). A petitioner can establish that his trial counsel was ineffective during plea negotiations if he can establish that the prosecutor extended the plea offer, his counsel failed to communicate the offer or misadvised him concerning the advantages of taking the offer, and that there is "a 'reasonable probability' that if he had been notified of the plea offer, he would have accepted it." *Id*. at 416 (quoting *Griffin*, 330 F.3d at 737).

Counsel must, however, respect a client's decision to proceed to trial or plead guilty to the charges. As the Sixth Circuit has observed:

> The decision to plead guilty—first, last, and always—rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Smith*, 348 F.3d at 552.

Mickel does not deny that his counsel communicated with him on numerous occasions prior to trial to discuss the case. (*See* Doc. No. 83-1, at 12 (defendant noting that "the frequency of meeting is not in question").) Additionally, at the start and/or end of each pretrial video conference the Court conducted, the Court permitted Mickel and his counsel to speak privately in a virtual breakout room. (*See, e.g*., Doc. No. 54, at 7; Doc. No. 51, at 24.) Mickel further concedes that he discussed sentencing exposure with counsel (*see* Doc. No. 83-1, at 12), and that he discussed the elements that the government needed to prove and trial strategy. (*See id*. at 12, 17 (discussed stipulating to certain facts associated with elements of the crime); *see also id*. at 12 (counsel advised him not to testify at trial due to his prior convictions).) Mickel has failed to demonstrate that his counsel neglected to adequately review the charges, discuss the evidence, or explain the sentencing exposure with his client.

More to the point, the record is clear that Mickel was determined to go to trial. As set forth above, Mickel expressed on numerous occasions his desire to go to trial as soon as possible. (Doc. No. 52, at 10; Doc. No. 53, at 5.) In his motion, Mickel confirms that it was his intent to defend the charges in a jury trial. (*See* Doc. No. 83-1, at 12.) The Court accommodated his wishes and even permitted Mickel's case to be the first tried in the Akron federal courthouse following the reopening of the courts during the pandemic. (*See* Doc. No. 51, at 6.) At the end of the day, counsel had an obligation to accept his client's decision to go to trial. *See Smith*, 348 F.3d at 552.

Additionally, Mickel suggests that his counsel should have presented him with "options." (Doc. No. 83-1, at 12.) He does not indicate what options counsel should have offered. Further, it is undisputed that the government extended no plea offers in this case. Even though Mickel was insistent on proceeding to trial, defense counsel did pursue possible plea agreements with government's counsel. (Doc. No. 51, at 6–7.) As the parties confirmed at the final pretrial conference, however, these inquires did not result any formal plea offer from the government. The only option available to Mickel—short of going to trial—was a general plea to the indictment "as is"—something Mickel was unwilling to do.  (*See id*. at 7.) Because Mickel cannot show that the government extended a plea offer that his counsel failed to communicate to him, he cannot meet the first prong of the *Strickland* test. *See Guerrero*, 383 F.3d at 416. Given that the record is clear that he was determined to go to trial, his allegations fail as to *Strickland*'s second prong as well. *See id*.

### 2. *Pretrial Investigation*

Closely aligned with the duty to inform a client of available options is the duty to conduct reasonable investigations or make a reasonable decision that investigations are unnecessary. *See*

12

*Sims v. Livesay*, 970 F.2d 1575, 1580–81 (6th Cir. 1992) (citing *Strickland*, 466 U.S. at 690–91). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also Carson v. United States*, 3 F. App'x 321, 324 (6th Cir. 2001) ("While the temptation to rely on hindsight is particularly strong in the context of ineffective assistance claims based on counsel's failure to investigate, the court must conclude that counsel's strategic choices made after less than complete investigation are not constitutionally deficient if a reasonable professional judgment supports the limitations on investigation." (citing *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998))).

Mickel maintains that his counsel failed to conduct an adequate pretrial investigation, but his claim is largely supported by conclusory allegations. For example, he asserts that counsel failed to "research the case law, interview witnesses[,] [and] investigate the facts of Mickel's case." (Doc. No. 83-1, at 14.) Yet, Mickel fails to identify the case law counsel should have reviewed, the witnesses he should have interviewed, and the facts he should have uncovered. Moreover, defense counsel identified two potential witnesses that might be called to testify (Doc. No. 35) and both were, in fact, called by the defendant and testified at trial. (Doc. No. 56 at pp. 182-98.) It is well settled that a motion to vacate that merely states general conclusions of law without substantiating these empty allegations with supporting facts is without legal merit. *See Wingo*, 454 F.2d at 53 (§ 2255 movant must set forth facts which entitle him to relief); *O'Malley*, 285 F.2d 735 (similar); *see also Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017) (perfunctory and undeveloped arguments, "unaccompanied by some effort at developed argumentation[,]" are waived);

*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court . . . to put flesh on its bones." (citation omitted)).

Likewise, his suggestion that counsel should have employed the services of a private investigator "to piece together facts in this case" falls flat. (Doc. No. 83-1, at 15.) Mickel suggests that a private investigator could have "investigated the whereabouts of the prior tenants[,]" but he fails to explain how locating the prior tenants of the Lorain, Ohio residence would have assisted the defense or otherwise demonstrate how the prior tenants' unknown testimony would have likely resulted in a different outcome at trial. (*Id.*) Again, such vague and conclusory allegations—devoid of factual support—are insufficient to warrant relief from a lawful sentence. *See Wingo*, 454 F.3d at 53; *O'Malley*, 285 F.2d at 735; *see also McPherson*, 125 F.3d at 995–96.

Mickel also posits, however, that counsel "could have had the suit and ammunition undergo[] DNA testing which could have further proven Mickel's innocence." (Doc. No. 83-1, at 15.) Again, he does not elaborate on how this evidence could have assisted the defense, nor could he credibly do so. Mickel was charged with being a felon in *possession* of ammunition. It was not necessary that the government prove that Mickel owned the ammunition, or even that he had previously touched it. For purposes of § 922(g)(1), the government need only prove that the defendant possessed the ammunition, either though actual or constructive possession. *See United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997) (citation omitted); *see also United States v. Moreno*, 933 F.2d 362, 373 (6th Cir. 1991) ("Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." (citation

14

omitted)); *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993) (holding that "constructive possession also exists when the person has dominion over the premises where the firearm is located"). Here, the ammunition was located in a residence in which Mickel had been living for several months and over which he exercised dominion and control. Additionally, Mickel admitted to the APA officers present during the search that he was aware of the ammunition and had personally caused it to be moved. Because the existence (or absence) of DNA evidence found on the jacket and ammunition would not have likely resulted in an acquittal, Mickel cannot establish either prong of the *Strickland* ineffectiveness test.

Moreover, it is clear that defense counsel intended to utilize the absence of any DNA evidence to discredit the government's investigation. In his closing argument, counsel observed that the government could have tested the suit for DNA evidence or fingerprints, but failed to do so. (Doc. No. 57 (Trial Transcript), at 37.) Noting that the government "did not provide [the jury] any forensic link between [the] suit and Ronald Mickel," he argued that this lack of evidence constituted "reasonable doubt." (*Id.*) The legitimate trial strategy of emphasizing the government's purportedly deficient investigation is entitled to deference in the absence of any evidence that it was unreasonable. *See, e.g.*, *Common v. United States*, No. 1:12-cr-82, 2018 WL 4604018, at *4 (E.D. Tenn. Sept. 25, 2018) ("Trial counsel's tactical decision to attack the lack of thoroughness of the officers' investigation and not to do their investigation for them by seeking DNA on her own cannot be said to be unreasonable.").

This first ground for relief is denied.

**B.  Trial Proceedings (Ground Two)**

In his second ground for relief, Mickel argues that counsel's performance at trial was constitutionally ineffective because he did not provide Mickel "with clear strategy on how his counsel would attack the case." (Doc. No. 83-1, at 17.) He further contends that defense counsel failed to subpoena and call certain witnesses. (*Id.*)

    *1.  Trial Strategy*

Mickel challenges his counsel's trial strategy by complaining that counsel "encouraged [him] to stipulate" to some "elements of the offense that the government bore the burden of proving beyond a reasonable doubt." (*Id.*) As previously noted, the parties stipulated that Mickel was aware that he previously had been convicted of a crime punishable by more than one year in prison, and that the ammunition in question was manufactured outside the State of Ohio and, therefore, traveled in interstate commerce. (Doc. No. 56, at 16–17.) With respect to the interstate commerce element, Mickel claims that he did not know that the ammunition had traveled in interstate commerce. He further maintains that he did not consent to either stipulation in writing. (Doc. No. 83-1, at 17–18.)

The Sixth Circuit has observed that "factual stipulations to elements of a crime are often the product of a sound trial strategy." *United States v. Monghan*, 409 F. App'x 872, 877 (6th Cir. 2011) ("For example, where a prior felony conviction is an element of the offense, a sound strategy may be to stipulate to the existence of the conviction rather than allow the jury to hear details about the earlier crime." (citation omitted)). Based on the record, the Court cannot find that counsel's decision to stipulate to his client's prior felony conviction to prevent the jury from learning the nature and unsavory details of his felony aggravated robbery conviction was deficient. "Indeed[,]

[in the case of felon-in-possession prosecutions], defendants commonly stipulate at trial to their status as felons so that the jury does not learn easy-to-prove (yet highly prejudicial) evidence about their past crimes." *Wallace v. United States*, 43 F.4th 595, 603 (6th Cir. 2022) (citing *Old Chief v. United States*, 591 U.S. 172, 180–92, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997)).

Moreover, Mickel has not suggested that the government would have been unable to demonstrate the existence of his prior felony conviction, as the conviction is a matter of public record.  (*See* https://cp.onlinedockets.com/loraincp/case_dockets/Docket.aspx?CaseID=150550, last visited 5/1/2024.) Under these circumstances, the Court cannot find that the decision to stipulate to a prior qualifying felony conviction amounted to ineffectiveness. *See Greer v. United States*, 593 U.S. 503, 510, 141 S. Ct. 2090, 210 L. Ed. 2d 121 (2021) (recognizing, in the wake of Supreme Court case law requiring the government to prove that a defendant knew he belonged to the group of individuals prohibited from owning or possessing weapons, "demonstrating prejudice [for an error under *Rehaif v. United States*[4]] will be difficult for most convicted felons for one simple reason: [c]onvicted felons typically know they're convicted felons" (quotation marks and citations omitted)).

The decision to stipulate to the connection to interstate commerce also constitutes sound strategy.  Mickel does not suggest that the government would have been unable to meet its relatively minimal burden of establishing that the ammunition traveled in interstate commerce. *See United States v. Rashid*, 483 F. Supp. 3d 529, 531 (S.D. Ohio 2020) (noting that the Sixth Circuit

---

[4] Under *Rehaif v. United States*, 588 U.S. __, 139 S. Ct. 2191, 2200, 204 L. Ed. 2d 594 (2019), the Supreme Court held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm [or ammunition] and that he knew he belonged to the relevant category of persons barred from possessing a firearm [or ammunition]."

has held that § 922(g)(1) "does not require a substantial connection to interstate commerce" (quoting *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003))). And while Mickel maintains that he was personally unaware that the ammunition had traveled in interstate commerce, the felon-in-possession statute does not require such knowledge. *See* Sixth Circuit Pattern Instruction § 12.01 (Possession of Firearm or Ammunition by Convicted Felon, Committee Commentary) (citing *Rehaif*, 139 S. Ct. at 2196) ("The government need not prove that the defendant knew that the firearm [or ammunition] traveled in or affected interstate commerce."); *United States v. Williams*, 75 F. App'x 480, 485 (6th Cir. 2003) (district court properly instructed the jury that the government need not prove that defendant knew that the firearm had traveled in interstate commerce (citations omitted)); *see also United States v. Vincent*, 20 F.3d 229, 236 (6th Cir. 1994) (holding that the mere fact that a defendant possessed a firearm that was manufactured in a different state establishes nexus with interstate commerce to support the defendant's conviction for possession of a firearm by a felon).

Because Mickel cannot establish that his counsel was deficient for advising him to stipulate to his knowing status as a felon and the ammunition's connection to interstate commerce (specifically, that the ammunition was manufactured outside of the State of Ohio) or that the stipulations prejudiced him in any way, he cannot meet either prong of the *Strickland* test.[5] The

---

[5] Mickel also alleges in a conclusory fashion that counsel should have "instruct[ed] the jury and the court properly regarding the circumstances; using the same 404(b) evidence that the prosecutor used to weave a tale that made Mickel look complicit." (Doc. No. 83-1, at 19.) Mickel fails to identify the Fed. R. Evid. 404(b) "other acts" evidence to which he refers, or otherwise explain how it should have been utilized at trial. He further suggests that there was "sufficient proof of the numerous times the evidence could have been falsified and [counsel] was given multiple leads on how it can be pursued, but he took no action." (*Id.*) Again, he fails to identify the "sufficient proof" showing that any of the evidence offered by the government had been falsified, and he does not elaborate on the "leads" that he gave counsel that were not pursued. These conclusory allegations, without more, are insufficient to satisfy his burden on collateral review. *McQueen*, 58 F. App'x at 76; *see Wingo*, 454 F.2d at 53.

portion of Ground Two relating to trial strategy is denied.[6]

### 2. *Calling Defense Witnesses*

Mickel also argues that his counsel was constitutionally ineffective at trial for failing "to subpoena the former tenants and homeowner of the house which Mickel rented." (Doc. No. 83-1, at 19 (capitalization and emphasis omitted).) He suggests that the homeowner—Raymond Campana—"could have attested that [he and Mickel] had an Agreement wherein, Mickel had two months of free house rental in exchange [for] cleaning up the house." (*Id*.) Mickel explains that the unnamed former tenants had left the house in disarray, and he speculates that they may have left behind the jacket containing the ammunition. (*Id*. at 19–20 (suggesting that "there is a great chance that the jacket suit belonged to the previous tenants who unintentionally left [the jacket] and perhaps forgotten [sic] about it, too").)

A "lawyer's *Strickland* duty 'includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence.'" *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007) (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)). Nevertheless, "complaints about uncalled witnesses are disfavored because the presentation of testimonial evidence is a matter of trial strategy." *Noble v. United States*, No. 1:10-cr-51, 2018 WL 4441240, at *12 (E.D. Tenn. Sept. 17, 2018) (citing *Coble v. Dretke*, 444 F.3d 345, 350 (5th Cir. 2006)). In order to establish ineffectiveness from failing to call a witness, a defendant must

---

[6] Mickel maintains that he never consented "in writing" to the use of stipulations at trial. (Doc. No. 83-1, at 17.) The Court is unaware of any requirement that his consent to this trial strategy be in writing, and Mickel cites none. Further, Mickel claims that counsel did not "adequately" explain to him that the stipulations went to elements of the offense. (*Id*. at 18.) He suggests that, had he understood this, he would not have consented. (*Id*.) Even if true, Mickel does not deny that the government would have been able to establish his knowing status as a felon and the minimal connection to interstate commerce (that is, that the ammunition was manufactured out of the State of Ohio) required for conviction. This part of his claim would, therefore, still fall short of establishing the prejudice prong of *Strickland*.

produce evidence "creating a reasonable probability that the outcome of his trial would have been different[.]" *Goldsby v. United States*, 152 F. App'x 431, 436 (6th Cir. 2005) (denying defendant's claim that his counsel was ineffective for failing to call an individual at trial where he failed to come forward with evidence showing that the uncalled witness's testimony would have yielded favorable evidence that could have resulted in a different outcome).

Here, Mickel alleges that his counsel failed to call Campana at trial. This is simply untrue. Counsel called Campana as one of two witnesses who testified on behalf of defendant. (Doc. No. 56, at 81–90 (Campana's trial testimony).) While the focus of Campana's testimony was the behavior of Cobbs following the end of her relationship with Mickel, counsel specifically elicited testimony from Campana regarding the mess left by the prior tenants and the arrangement with Mickel whereby Mickel received two months of free rent in exchange for cleaning up the house. (*Id*. at 90 ("That was part of our agreement. They left it quite a mess, and part of the agreement was two months free rent to clean up the house.").) Mickel's suggestion that counsel was ineffective for failing to call Campana to elicit this testimony finds absolutely no support in the record.

As for counsel's failure to call the unnamed former tenants, Mickel speculates that these unknown individuals would have testified that the jacket (and presumably the ammunition) belonged to them. (*See* Doc. No. 83-1, at 19–20.) There are two problems with this argument. First, defendant has failed to offer any evidence that counsel would have had reason to believe that the former tenants would have testified in the manner now suggested by Mickel. *See Goldsby*, 152 F. App'x at 436. Second, even if one of them would have testified that they owned the jacket and ammunition, it would not have changed the outcome at trial. As explained above, the government

needed only to prove that Mickel *possessed* the ammunition, either actually or constructively. That someone else once owned or possessed the ammunition would not have constituted a valid defense to the charge. Since Mickel cannot establish that his counsel was ineffective, or that absent any ineffectiveness there is a reasonable probability that the result would have been different, Mickel's second ground for relief is denied.

### C.  Sentencing (Ground Three)

In Ground Three, Mickel claims his counsel was ineffective at sentencing for failing to: (1) review, discuss, and explain the PSR; (2) file substantive objections to the PSR; and (3) file a notice of appeal. (Doc. No. 83-1, at 21.) The government suggests that this final ground for relief finds no support in the record and is entirely without merit. (Doc. No. 87, at 18–19.) The Court agrees with the government.

Mickel's first allegation is directly refuted by the record. At the start of the sentencing hearing, the Court inquired of Mickel as follows:

The Court: Now, Mr. Mickel, have you received and reviewed a copy of the presentence report, sir?

The Defendant: Yes, I received it two days ago.

The Court: Okay. Have you had a chance to discuss it [with] your attorney?

The Defendant: We discussed it briefly, yeah, too, today.

The Court: Do you need some additional time to discuss this with your attorney, sir?

The Defendant: I was advised that we should.

The Court: I'm sorry, sir?

The Defendant: I was advised that we should proceed.

21

The Court: Well – and we will proceed, but if you need additional time to discuss the presentence report with your attorney, I will certainly provide that to you.

The Defendant: We can proceed.

(Doc. No. 74 (Sentencing Hearing Transcript), at 5.) From this exchange, it is clear that Mickel and his counsel discussed the PSR prior to sentencing and that Mickel was afforded, but rejected, the Court's offer to permit additional time to discuss the PSR with his attorney. His suggestion that this did not happen finds no support in the record, and this baseless allegation does not support a finding of ineffective assistance of counsel.

Mickel's second allegation—that his counsel did not file objections to the PSR—likewise finds no support in the record. In fact, counsel raised numerous objections to the PSR, most relating to the question of whether Mickel qualified as an armed career criminal under the ACCA. (*See* Doc. No. 63, at 3, 7–26 (discussing the objections to the PSR); Doc. No. 74, at 6 (the Court noting that "the defendant has filed a very comprehensive sentencing memorandum setting forth a number of objections" to the PSR). While these objections were ultimately overruled by the Court after a protracted hearing that occurred over two days and necessitated the filing of supplemental briefing from the parties, counsel's exhaustive efforts to contest Mickel's status as an armed career criminal can hardly be considered deficient.

To the extent that Mickel is attempting to use the present motion to vacate to revisit the underlying question of whether the Court properly applied the ACCA enhancement to Mickel's sentence, such a use is inappropriate. This issue was squarely raised and rejected by the Sixth Circuit on direct appeal. (Doc. No. 76, at 2–5.) *See Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) (holding that "a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absently highly exceptional circumstances, such as an

22

intervening change in the law" (citations omitted)); *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999) (similar); *see also Pego v. United States*, No. 12-cr-20496, 2016 WL 4698783, at *2 (E.D. Mich. Mar. 22, 2016) (holding that "a movant cannot use a § 2255 proceeding, in the guise of ineffective assistance of counsel, to relitigate issues decided adversely to him on direct appeal" (quotation marks and citations omitted, collecting cases)).

This leaves for consideration Mickel's final claim that his counsel failed to file a notice of appeal. (Doc. No. 83-1, at 21.) While Mickel clarifies in his supporting memorandum that his counsel did file a timely notice of appeal (*see* Doc. No. 72 (Notice of Appeal)), he appears to suggest that counsel failed to communicate this fact to him, which purportedly deprived him of the chance to assist in the preparation of the direct appeal. (*See* Doc. No. 83-1, at 28; Doc. No. 87, at 18; Doc. No. 91, at 9.) Even if this is true (and Mickel has offered no evidence that it is true), Mickel has failed to come forward with any evidence that establishes prejudice. He does not identify, and the record does not reflect, any potentially meritorious arguments counsel should have, but did not, raise on appeal. *See also Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986) ("'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983)). Mickel's claim of the denial of effective assistance of counsel on appeal therefore also fails.

## IV.    CONCLUSION

For the foregoing reasons, Mickel's motion to vacate, set aside, or correct his sentence is denied. Further, for all of the same reasons, the Court finds that "reasonable jurists" would not debate the Court's denial of Mickel's motion to vacate. *See Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000). Accordingly, the Court certifies that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED**.


Dated: May 9, 2024

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**